No. 37,079

E. P. Stockman, *Appellee*, v. The Farmers Union Central Co-Operative Exchange, *Appellant*.

(190 P. 2d 407)

Opinion filed March 6, 1948.

*D. C. Hill*, of Wamego, was on the briefs for the appellant.

*D. M. Sparks*, of St. Marys, and *R. H. Kaul*, of Wamego, were on the briefs for the appellee.

The opinion of the court was delivered by

Smith, J.: This is an action upon a written contract. The trial court overruled defendant's demurrer to plaintiff's petition. Defendant has appealed.

The contract is rather unique. Its terms will be set out at the outset. It was one to produce hybrid seed corn. Plaintiff was the grower, defendant company the buyer. The parties will be referred to hereafter by those terms.

Paragraph 1 stated that the grower agreed to plant, tend and produce specified acres of hybrid seed corn.

Paragraph 2 described how this corn was to be planted, that is, two rows of male parent corn and six rows of female parent corn alternating; that plants not true to type in the male rows were to be disposed of; that all tassels must be pulled from the female rows; that corn produced on the male rows could not be used for seed corn but was commercial corn; that the corn produced in the female row was hybrid seed corn.

Paragraph 3 provided that the company would furnish the grower without charge all parent corn and it was to be planted in accordance with the contract.

In paragraph 4 the grower took notice that the corn was to be produced in strict accordance with the "Rules for Certification" issued by the Kansas Corporation Improvement Association.

Paragraph 5 provided that the corn should be planted between April 25 and May 15, as the company might direct, and if it was not planted by May 15, 1946, the company might cancel the contract without liability.

In paragraph 6 the company agreed to perform all labor required in the detasseling of the female stalks and in derogueing the male rows.

In paragraph 7 the grower agreed as to the distance the rows should be apart and how close together the kernels should be in the row.

Paragraph 8 provided that the grower might use for feed the commercial male corn, and he agreed that he would not use or sell it for seed corn.

Paragraph 9 provided that the grower might pick and deliver the seed corn to the bins of the seed company at St. Marys, Kan., but that if excessive scuffing or shelling should result the company might require in writing that the corn be husked by hand. The paragraph then contained the following provisions, which, on account of its importance, is quoted verbatim as follows:

"If the Grower picks said corn, it shall be delivered at the rate requested by the Company on each day that the weather and ground conditions permit, beginning on such date as the Company may specify and continuing until all of said corn has been delivered. If, for any reason, the Grower cannot pick and deliver the corn as above provided, the Company may pick said corn charging the Grower the current rate therefor, and will deliver the corn charging the Grower a rate equivalent to the trucking rate from the Grower's field to his nearest market."

It will be seen the above provision gave the company the right to call on the grower to deliver any amount of seed corn on any day when he could get into the field to gather it and that if the grower could not pick and deliver the corn at the rate requested by the company, then the company could enter on the grower's farm, pick the corn and charge the grower therefor.

Paragraph 10 provided that all quantities should be determined by weight corrected for moisture and all payments should be based on weight, exclusive of husks, allowing fifteen percent for moisture.

Paragraph 11 is the paragraph really upon which this case turns. It will be quoted verbatim and is as follows:

"11. The Company agrees to pay the Grower for all seed corn, produced and delivered in accordance herewith, the top price being paid by The Farmers Union Elevator, St. Marys Kansas, for corn of the same color, and in addition a premium of 30 per bushel, the Grower having the privilege of establishing a price, on said seed corn delivered or to be delivered, as of any day after October 1, 1946, and before February 1, 1947, the establishment of such price to be in writing, and, if no date is selected by the Grower in writing, then the date of delivery shall be taken as his election."

Paragraph 12 provided that if weather conditions caused germination of the seed corn to fall below eighty-five percent or if certain contingencies or inability to secure sufficient labor prevented the proper detasseling of the field or the operation of the company's nearest plant during any part of the corn harvest season or in case the contract be canceled for any reason stated in section 13, the company should, if it so elected, not be required to take the corn.

Paragraph 13 provided that if corn of an opposite color, sweet corn or pop corn, should be planted within forty rods of the seed field, the contract might be canceled.

Paragraph 14 gave the company and its agents the right to enter upon the field of the grower for the purpose of inspection, thinning stand, derogueing, detasseling and ascertaining that the instructions and directions of the company were being complied with.

Paragraph 15 provided that the grower agreed the parent corn furnished by the company should remain the property of the company, and that the company should have a lien to secure the performance of the contract upon the crop produced from the parent corn.

Paragraph 16 provided that the rights, remedies and interests created by the contract should inure to the benefit of any successor in interest to the company and might be assigned by the grower with the written consent of the company.

Paragraph 17 provided that the grower agreed not to sell or give away any seed corn nor himself use as seed corn any corn produced from parent corn furnished by the company to him.

Paragraph 18 provided that no change, modification or alteration of the terms of this contract shall be effective unless reduced to writing.

Attached to this contract was a document entitled "Consent by Landlord." It provided that the owner of the premises consented

to the agreement and agreed that the rights of the company should be superior to any landlord's lien. Exhibit "B" attached to the petition is important and will be set out verbatim. It is as follows:

"Notice Establishing Price of Seed Corn

"To: The Farmers Union Central Co-operative Exchange

"St. Marys, Kansas

"In accordance with the contract entered into by and between the above company and the undersigned Grower, said Grower hereby elects that the price of the seed corn to be delivered by him to said company under said contract shall be the price paid by The Farmers Union Elevator, St. Marys, Kansas, for corn of the same color, on the 5th day of October, 1946, and in addition a premium of .30¢ per bushel as provided in said contract.

"Dated this 7th day of December, 1946."

After identification of the parties, the petition stated the contract had been entered into and referred to it as Exhibit "A"; that on the 5th of October, 1946, the plaintiff stated orally to the general manager of the defendant that he elected that the price of the seed corn to be delivered by him to defendant under the contract would be the price paid by the Farmers Union Elevator, St. Marys, Kan., for corn of the same color on the 5th of October, 1946, together with the premium of 30 cents per bushel, as provided in the contract. The petition then contained the following allegation, which is important here and which will be set out verbatim, as follows:

"The said defendant, by its said manager, the said E. K. Dean, refused to accept such election and stated that said plaintiff could not make his election on said date for the reason that there was no market price established for corn by the Kansas City, Missouri, Board of Trade on that date, and further, that plaintiff could not make his election on said date as the corn grown by him was not ready for delivery, and further, that said defendant would pay said plaintiff for the corn grown and produced by him, the price as of the date of delivery and no other.

"Plaintiff further alleges that on the 9th day of December, 1946, said plaintiff delivered a written notice to said defendant, a copy of which notice is hereto attached, made a part hereof and marked Exhibit 'B'; which written notice informed the said defendant that the said plaintiff elected that the price of the seed corn to be delivered by him to said defendant under said contract would be the price paid by The Farmers Union Elevator, St. Marys, Kansas, for corn of the same color, on the 5th day of October, 1946, together with premium of thirty cents per bushel as provided in said contract."

The petition then alleged that on the 13th day of January, 1947, plaintiff completed delivery of his corn in the amount of 3,623 bushels and 50 pounds; that the defendant had not informed plaintiff of the amount of shrinkage for moisture, if any, as provided in

the contract; that the seed corn so delivered was white corn and the price paid by The Farmers Union Elevator, St. Marys, Kan., for white corn on the 5th day of October, 1946, was $2.05 per bushel.

Judgment was prayed for $8,515.73 with interest at the rate of 6 percent per annum from the 13th day of January, 1947. This is the amount 3,623 bushels and 50 pounds of corn would bring at the price of $2.35 per bushel, which is the price alleged plus 30 cents premium, as provided in the contract.

No motion was filed to compel the plaintiff to make this petition more definite and certain. The petition must be liberally construed in favor of the pleader. The defendant demurred on the sole ground that the petition did not state facts sufficient to constitute a cause of action in favor of plaintiff and against the defendant. This demurrer was overruled—hence this appeal.

Appellant argues that the demurrer should have been sustained, first because when plaintiff stated orally to the general manager of the defendant on October 5 that he wished to establish the price as of that date he did not comply with the contract since it provided that the price should be fixed by the grower electing in writing the price of which day he wished to establish. Defendant argues that where written notice is specified on the part of one of the parties to a contract it is imperative that such notice must be given in writing. The defendant relies in the main upon the case of *Idaho Grimm, etc., Assn. v. Stroschein,* 42 Idaho 12, 242 Pac. 444.

That was an action upon a marketing contract where the parties to an association agreement were bound by a marketing agreement if the board of directors of the association gave notice in writing that it elected to have them bound. They did not give this written notice but the association sought to have the member bound because he attended meetings and knew what the association was doing and that its plans were to hold the members to the marketing contract. The court held that the notice to hold the members should have been given in writing.

The opinion is not entitled to the weight contended for it by defendant here. In this action the petition pleads that at the very outset of the corn gathering season plaintiff told defendant orally of the day he selected as the price establishing day for him under the contract; that the defendant then informed him that it did not intend to comply with or be bound by the contract in that respect. The giving of a written notice of the day selected would have been

a useless gesture under the circumstances. The law does not require the doing of a vain and useless act so it is doubtful if plaintiff was required to give a written notice under the facts and circumstances pleaded.

We do not place the decision on that ground, however. We do place it on the ground that plaintiff by giving his written notice on December 7, 1946, that he desired to establish for himself the price paid by the elevator on October 5, 1946, complied both in letter and spirit with the plain, unambiguous terms of the contract. It requires only an examination of the contract as a whole, especially paragraph 11, to establish this. The contract is peculiar in that the grower only had one buyer for the seed corn grown by him. That buyer was the company. He had no option whatever on what day he would deliver. He agreed to deliver it at the rate requested by the company on each day. The contract further provided that if any grower could not gather his corn the company might enter upon the grower's land and gather the corn itself in any amount on any day it wished. Under such circumstances, the provisions of paragraph 11, as we are about to interpret them, were the only fair means of fixing the price the grower had. Paragraph 11 says first "the top price being paid by the elevator plus a premium of 30 cents." That standing alone would not mean anything because as everyone in a corn growing country knows, the price of corn at an elevator fluctuates from day to day, sometimes from hour to hour. So the contract, to protect the grower, provided that he should have the privilege of establishing a price by naming a day when he wished the price paid by the elevator on the day to be the price to be paid him. The next words are important, the contract provided that the grower could establish a price "on corn delivered." This means on corn delivered in the past from the ordinary meaning of the language. The next words, "or to be delivered," mean corn to be delivered in the future. The contract contemplated that some growers might desire to fix the price to be paid early in the season while some might desire to wait. They need do either one. The contract specifically provided for the privilege of establishing a price by the grower and how and when it should be exercised. There is nothing equivocal or ambiguous about it. This right had to be exercised after October 1, 1946, and before February 1, 1947, and it must be by notice in writing and by such notice the grower could establish the price of any day he chose. The plaintiff did give such

notice in writing. He gave it on December 7, 1946. This was well within the time specified in the contract. Any time before February 1, 1947, would have been sufficient. The rule is well stated in 41 Am. Jur. 356, as follows:

"If a complaint is based on contract, all that is necessary to state is the making of the contract, the obligation thereby assumed, and the breach. The contract in such a case contains the primary right of the plaintiff. In the obligation assumed by the defendant is found his duty, and his failure to comply with the duty constitutes the breach. When these statements are supplemented with a statement of the amount claimed and a prayer for judgment, the complaint is complete."

In *Hazelton v. Chaffin*, 109 Kan. 175, 197 Pac. 870, we said in speaking of a contract:

"The contract is simple and unambiguous in its terms; it gives no hint or intimation of the creation of a trust; nor within its terms can there be discerned any qualification or limitation of the defendant's obligation to pay the quarterly rent. While defendant's brother may have fully explained to plaintiff the project to collect a number of leases for the purpose of prospecting for and developing gas and oil and that defendant should hold the leases until a well was developed by McGinnis & Company and then assign the leases to them, the written contract between plaintiffs and defendant is unqualified and unencumbered by any reference to those arrangements or those conditions. If these facts were pertinent to the contract, defendant should have incorporated them in the written instrument to which he attached his name. If he did not intend to pay rent after the first year until a well was commenced on plaintiff's property he ought not to have signed his name to a contract binding himself to pay such rent. It should be borne in mind that courts do not make contracts. They merely enforce the contracts to which the contracting parties have voluntarily bound themselves." (p. 177.)

The authorities on this point are plentiful.

Appellant argues that to hold the notice in writing of December 7 to be sufficient compliance with the contract as to establishment of a price is equivalent to saying that the grower was entitled to the highest price paid by the Farmers Union Elevator Company for corn of the same color. That is the actual meaning of the contract. It is true plaintiff specified the same day in his written notice that he specified in his oral conversation with the defendant. However, that is just a circumstance. Under the terms of this contract the grower could have waited until the first of February and then specified what day's price he wished to establish. It is a little difficult to see the theory of defendant in demurring to this petition since under its allegations, at which no motion to make definite and certain

was leveled, the defendant has the plaintiff's seed corn and has not paid him anything for it, and when defendant received it it told him it intended to breach the contract by not paying him in accordance with it.

The judgment of the trial court is affirmed.